**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,**<br><br>                              **Plaintiff,**<br><br>        v.<br><br>**MANGO LABS, LLC, MANGO DAO, and BLOCKWORKS FOUNDATION,**<br><br>                              **Defendants.** | **Civil Action No. 1:24-cv-7334**<br><br>**Jury Trial Demanded** |

## COMPLAINT

Plaintiff United States Securities and Exchange Commission ("SEC") for its Complaint against Mango Labs, LLC ("Mango Labs"), Mango DAO ("Mango DAO"), and Blockworks Foundation ("Blockworks Foundation") (collectively, "Defendants") alleges as follows:

## SUMMARY

1.      A crypto asset trading platform known as "Mango Markets" has operated since approximately August 2021. Mango Markets offers various services to its users, including the ability to trade crypto assets being offered and sold as securities. Blockworks Foundation and Mango Labs have been, and continue to be, responsible for the development and operation of Mango Markets. Mango DAO, an unincorporated organization, professes to be the governing body of Mango Markets.

2.      Although Mango Markets employs blockchain technology to conduct its business, Defendants perform typical securities market activities. First, Mango DAO and Blockworks Foundation engaged in the offer and sale of securities but did not register those offers and sales as is required by the federal securities laws. Specifically, in August 2021, Mango DAO and

Blockworks Foundation raised over $70 million through the unregistered offer and sale of 500 million crypto assets called "MNGO" to hundreds of investors worldwide, including to U.S. investors. MNGO is the so-called "governance token" of Mango Markets, and Mango DAO and Blockworks Foundation offered and sold MNGO tokens as investment contracts and, therefore, securities. Yet, no registration statements were filed or in effect for the offer and sale of MNGO tokens and no exemption from registration was available.

3.      In doing so, Mango DAO and Blockworks Foundation violated the federal securities laws and denied investors the protections afforded to them by the registration provisions of the federal securities laws. These include, among other things, the requirement an issuer disclose material information about its securities offering in registration statements filed with the SEC, including the issuer's business and financial condition, which gives investors the information they need to make informed investment decisions.

4.      Second, Blockworks Foundation and Mango Labs performed a typical securities market function: brokering securities transactions. They did this through their operation of Mango Markets. Blockworks Foundation and Mango Labs actively solicited and recruited Mango Markets users to trade various crypto assets being offered and sold as securities, provided advice and valuations as to the merits of an investment in these assets, and helped to facilitate transactions in these assets on the Mango Markets platform by assisting users in opening accounts and regularly handling user funds and the crypto assets being offered and sold as securities.

5.      Through these activities, Blockworks Foundation and Mango Labs performed brokerage functions. However, neither Blockworks Foundation nor Mango Labs has registered as a broker with the SEC, in violation of the federal securities laws. As further explained below,

the broker registration provisions include requirements related to disclosure, recordkeeping, inspection, and conflict-of-interest mitigation requirements. Registration also requires broker-dealers to comply with applicable financial responsibility requirements that protect investors and other market participants.

6.      By skirting the registration provisions, Defendants deprived investors of critical protections afforded to them by the federal securities laws.

## VIOLATIONS

7.      Through the unregistered offer and sale of MNGO tokens as investment contracts in August 2021, Mango DAO and Blockworks Foundation have each engaged in unregistered offers and sales of securities in violation of Sections 5(a) and (c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a) and 77e(c)].

8.      In addition, by engaging in the conduct set forth in this Complaint, Blockworks Foundation and Mango Labs have each acted as a broker, without registering as such, in violation of Section 15(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78o].

9.      Unless Defendants are restrained and enjoined, they will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDING AND RELIEF SOUGHT

10.      The SEC brings this action pursuant to the authority conferred upon it by Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)], and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

11.      The SEC seeks a final judgment: (a) permanently enjoining Defendants from

violating the federal securities laws this Complaint alleges they have each violated; (b) ordering Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and (c) ordering any other and further relief, including equitable relief and other relief pursuant to Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], the Court may deem just and proper.

## JURISDICTION AND VENUE

12.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, Sections 20(b), 20(d), and 22 of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v], and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

13.     Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein.

14.     Venue is proper in this district pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Defendants conducted certain transactions, acts, practices, and courses of business constituting the violations alleged herein within this district, including offering and selling MNGO tokens as securities and providing brokerage services to investors located in this district.

## DEFENDANTS

15.     **Mango Labs** is a Wyoming corporation with its former principal place of business in California, and its current principal place of business in North Carolina. Following its formation in April 2022, Mango Labs, with Blockworks Foundation, worked on the continued development of Mango Markets. Mango Labs is not registered with the Commission in any capacity.

16.     **Mango DAO** is an unincorporated organization that calls itself a "decentralized autonomous organization" or "DAO," and is composed of holders of MNGO, which were minted in 2021 by Mango DAO and Blockworks Foundation to be the so-called governance token for Mango DAO. Mango DAO purports to be the governing body of Mango Markets. According to a so-called "Litepaper" ("Litepaper"), MNGO "token holders have the power to upgrade the protocol as they see fit, only constrained by the checks-and-balances of the DAO." Mango DAO purports to have no principal place of business and has no corporate registration. Mango DAO is not registered with the Commission in any capacity.

17.     **Blockworks Foundation** is a Panamanian entity with an unknown place of business and a resident agent domiciled in Panama City, Panama. Blockworks Foundation was involved in the development of Mango Markets and the MNGO token sale in August 2021. Blockworks Foundation is not registered with the Commission in any capacity.

**OTHER RELEVANT ENTITY**

18.     **Mango Markets** is a crypto asset trading platform built on a cryptographically secured ledger known as the "Solana blockchain." Mango Markets is not a separate legal entity.

**BACKGROUND**

I.     **Statutory and Legal Framework**

19.     The Securities Act and the Exchange Act "form the backbone of American securities laws." *Slack Tech., LLC v. Pirani*, 598 U.S. 759, 762 (2023). These acts define "security" broadly, to include a wide range of assets, including "investment contracts." [15 U.S.C. §§ 77b(a), 78c(a)(10)].

20.     Investment contracts are contracts, transactions, or schemes through which a person invests money in a common enterprise and reasonably expects profits derived from the

entrepreneurial or managerial efforts of others.

21.    Congress defined "security" broadly to embody a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 299 (1946).

**A.**    **Registration of Securities Offerings**

22.    Congress enacted the Securities Act, in part, to regulate the offer and sale of securities.

23.    Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)] require registration of offers and sales of securities with the SEC.

24.    Registration is intended to assure that each person offering or selling securities gives the investing public required information about the issuer, the securities, and the transaction.  With that information, investors can then make informed investment decisions.

**B.**    **Registration of Brokers**

25.    Section 3(a)(4) of the Exchange Act [15 U.S.C. § 78c(a)(4)] defines "broker" generally as "any person engaged in the business of effecting transactions in securities for the account of others."

26.    Section 15(a) of the Exchange Act [15 U.S.C. § 78c(a)(4)] generally requires brokers to register with the SEC, and the broker must also become a member of one or more "self-regulatory organizations" ("SROs"), which, in turn, require members to adhere to rules governing the SRO's members' activities.

27.    The regulatory regime applicable to brokers is a cornerstone of the federal securities laws and provides important safeguards to investors and market participants.

Registered brokers are subject to comprehensive regulation and rules that include recordkeeping and reporting obligations, SEC and SRO examinations, and general and specific requirements aimed at addressing certain conflicts of interest, among other things. These rules and regulations are critical to the soundness of the national securities markets and to protecting investors who interact with brokers and invest in securities.

## II.    Crypto Assets

28.    As used herein, the term "crypto asset" or "token" generally refers to an asset issued and/or transferred using blockchain or distributed ledger technology, including an asset sometimes referred to colloquially as a "cryptocurrency," "virtual currency," and digital "coin."

29.    A blockchain is a database spread across a network of computers that records all transactions in theoretically unchangeable, digitally recorded data packages referred to as "blocks." The system relies on cryptographic techniques for secure recording of transactions.

30.    Some crypto assets may be "native tokens" to a particular blockchain – meaning that they are represented on their own blockchain – though other crypto assets may also be represented on that same blockchain.

31.    Crypto asset owners typically store the cryptographic key information that gives them control over their crypto assets on a piece of hardware or software called a "crypto asset wallet." Crypto asset wallets, among other functions, provide a user-friendly way to store and manage the "public keys" and the "private keys" associated with an investor's crypto assets. The public key is used to access the user's blockchain "address," and it can be freely shared with others. The private key is roughly analogous to a password; it confers the ability to transfer a crypto asset and transact using the user's public blockchain address. Whoever controls the private key controls the crypto asset(s) stored at that blockchain address.

7

## FACTS

### I.    Mango Markets

32.    Mango Markets is a crypto asset trading platform built on the Solana blockchain. Mango Markets first launched in or about March 2021.

33.    Mango Markets operates, in part, through websites that are accessible to the general public, including to persons in this district.

34.    As discussed in greater detail below, Mango DAO and Blockworks Foundation offered and sold the MNGO token, a so-called "governance token," as an investment contract and, therefore, as a security.

35.    In October 2022, an individual by the name of Avraham Eisenberg orchestrated an attack on Mango Markets by manipulating the market for the MNGO token, which caused Mango Markets to stop effecting transactions in securities temporarily, allowing him to steal at least $116 million worth of crypto assets from the Mango Markets platform. *See SEC v. Eisenberg*, 1:23-cv-503 (S.D.N.Y. Jan. 20, 2023); *United States v. Eisenberg*, 1:23-cr-10 (S.D.N.Y. Jan. 9. 2023); *CFTC v. Eisenberg*, 1:23-cv-173 (S.D.N.Y. Jan. 9, 2023).

### II.    Mango DAO and Blockworks Foundation Offered and Sold MNGO Tokens in Unregistered Securities Transactions.

#### A.    August 2021 MNGO Token Sale

36.    Between August 9 and 10, 2021, Mango DAO and Blockworks Foundation offered and sold 500 million MNGO tokens (5% of the maximum supply in existence) to the general public on the publicly available website https://www.token.mango.markets ("August 2021 MNGO Token Sale"). Blockworks Foundation controlled the website, which was available to investors in this district.

37.    To publicly promote the August 2021 MNGO Token Sale, Blockworks

Foundation prepared and published on the Mango Markets website and social media channels, which were available to investors in this district, among other things, a Litepaper that generally described the terms of the offering and certain rights that MNGO token holders would have.

38.     According to the Litepaper, participants had 24 hours, beginning on August 9, 2021, to deposit as much of the crypto asset USD Coin ("USDC") as they wanted, into a Mango Markets smart contract, referred to as a "vault" on the website.

39.     For the following 24 hours, beginning on August 10, 2021, incoming deposits were no longer allowed, but users could withdraw any USDC that they had deposited.

40.     The Litepaper stated that, at the end of the two-day period, "all USDC depositors will get [the 500 million MNGO] Token[s] in proportion to their share of the USDC vault."

41.     According to the Litepaper, buyers would receive what the Litepaper referred to as a "pro-rata price" for the MNGO token and the "sale price per token can be calculated with (total USDC in vault) / (500,000,000 [MNGO Token])."

42.     The Litepaper explained that this "price will fluctuate during the entire 48 hour period as USDC is deposited and withdrawn. However, during the last 24 hours, buyers may only withdraw USDC and so the Sale price can only decrease during that period. The Withdraw Only Period was added so that if a buyer deposits a large amount of USDC at the last second of the Unrestricted Period and raises the price significantly, other buyers still have an opportunity to get out of the sale."

43.     At the end of the August 2021 MNGO Token Sale, every participant who deposited their funds the first day and did not elect to withdraw them the second day got the same price for MNGO tokens: 0.141 USDC (or approximately $0.141 per token).

44.     The USDC that Mango DAO and Blockworks Foundation obtained through the

August 2021 MNGO Token Sale (with a purported value of over $70 million) went to the Mango DAO treasury for use as a so-called "insurance fund."

45.     U.S. investors were purportedly ineligible to participate in the August 2021 MNGO Token Sale. However, Mango DAO and Blockworks Foundation did not require that individuals provide identification or other know-your-customer verification to participate in the token sale. As a result, U.S. investors purchased MNGO tokens in the token sale.

46.     Numerous posts on Mango Markets' Twitter and Discord feeds during the August 2021 MNGO Token Sale discussed using virtual private network ("VPN") services to bypass the purported geofencing efforts of Mango DAO and Blockworks Foundation, and the https://www.token.mango.markets website, which Blockworks Foundation controlled through the MNGO token offering, received thousands of visits from users located within the United States during the sale.

47.     Immediately following the August 2021 MNGO Token Sale, the MNGO token was available for resale and thereby tradeable, including in the United States, through Mango Markets and on other crypto asset trading platforms.

48.     Beginning on August 11, 2021, the day after the sale concluded, Blockworks Foundation personnel announced on Mango Markets' Twitter and Discord feeds the names of the crypto asset trading platforms that had made the MNGO token available for trading, and updated the Mango Markets website to contain links to websites where investors could purchase and sell MNGO tokens.

49.     Both prior to and immediately following the offering, participants on Mango Market's Twitter and Discord feeds discussed when and how the MNGO token could be traded.

50.     Blockworks Foundation also retweeted a YouTube video on August 9, 2021 (the

first day of the sale) and a post in which commenters speculated that purchasers of the MNGO token were attempting to keep the price as low as possible so that it would rise when the token was made available for trading on secondary platforms following the sale.

51.     In addition to the August 2021 MNGO Token Sale of 5% of the MNGO token supply, Blockworks Foundation stated in the Litepaper and on its website that another 5% of the supply was issued to the Mango Markets "creators."

52.     Blockworks Foundation executed agreements with each of the "creators," who were individuals who contributed to the development and operation of the Mango Markets platform.

53.     Approximately 10 individual "creators" – at least half of whom are U.S. citizens – collectively received the 5% of the MNGO token supply in or about May 2021 as compensation for work performed for Mango Markets.

54.     The remaining 90% of the MNGO token supply was deposited in the Mango DAO treasury and could be unlocked and distributed only via governance proposals approved by the Mango DAO.

## B.     Mango DAO and Blockworks Foundation Offered and Sold MNGO as a Security.

55.     During the initial token sale, Mango DAO and Blockworks Foundation offered and sold MNGO tokens in exchange for money in the form of USDC.

56.     MNGO has been available to be bought and sold within the United States for fiat currency or in exchange for other crypto assets using the Mango Markets platform and other crypto asset trading platforms since August 11, 2021.

57.     Investors who purchased MNGO tokens during Mango DAO's and Blockworks Foundation's August 2021 MNGO Token Sale, as well as after the initial sales, invested in a

common enterprise.

58.    The price of all MNGO tokens goes up or down together. In other words, the price of the MNGO token of each token holder rose and fell equally such that each holder profited or suffered losses pro rata based on its ownership share of MNGO tokens.

59.    In addition, Blockworks Foundation publicly stated that the proceeds of the MNGO token sales would be pooled and used to pursue MNGO's projects.

60.    Blockworks Foundation also stated publicly that the funds raised through the sale of 5% of the MNGO token supply (with a purported value of over $70 million) went to the treasury of the Mango DAO for use as a so-called "insurance fund" that would exist, in essence, to backstop the financial obligations of Mango Markets in case of a financial disruption.

61.    According to the Litepaper, the "insurance fund will pay MNGO Perp[etual future]s smart contracts in the event extreme volatility causes bankrupt accounts and excess losses in the system."

62.    The information Blockworks Foundation publicly disseminated led investors, including those who purchased MNGO in the August 2021 MNGO Token Sale and more recently, to view MNGO as an investment in Defendants' efforts to grow the Mango Markets platform and to reasonably expect to profit from these efforts, because this growth would in turn increase the demand for and therefore the value of MNGO.

63.    The Litepaper contained a "Project Status & Roadmap" section, which detailed the efforts that Blockworks Foundation had taken – and would take (along with Mango Labs, following its formation in April 2022) – to develop the platform.

64.    Consistent with these representations, Blockworks Foundation and Mango Labs in fact provided significant managerial efforts to develop the platform, both prior to and following

the August 2021 MNGO Token Sale.

65.     For example, Blockworks Foundation and Mango Labs developed and deployed code for the different versions of the platform, created content for the Mango Markets' website, fed the content of Mango Markets' Twitter and Discord channels, submitted and voted on governance proposals, and responded to queries from MNGO token holders and others about the platform and the MNGO token on the Mango Markets' Twitter and Discord feeds.

66.     Blockworks Foundation promoted other opportunities available to MNGO token holders, including publicly stating that investors could use MNGO tokens to participate in liquidity provider pools on the Mango Markets platform, and token holders could earn more MNGO tokens as a reward for providing liquidity.

67.     In addition, Blockworks Foundation publicly stated that MNGO token holders could continuously earn interest on their tokens.

68.     According to the Litepaper, to "earn interest, simply deposit into your Mango Markets account; all assets automatically earn interest. Annual rates are displayed in the Account page in green."

69.     Based on the foregoing, MNGO token holders invested in a common enterprise with a reasonable expectation of profits derived from the efforts of others.

70.     No registration statement was filed with the SEC or in effect with respect to any of these offers and sales of MNGO, nor was any exemption from registration available.

     C.     **MNGO Holders' Voting Rights as to the Mango DAO**

71.     According to the Litepaper, the MNGO token also serves as a "governance token," whose ownership purportedly grants voting rights on proposals to dictate the Mango Markets protocol's future.

72.     While the Litepaper explained that "[a]nybody with 0.1% of Mango Token" could propose a governance action, the Mango DAO's website, which is available to U.S. investors at https://dao.mango.markets, set forth different amounts of MNGO tokens that were required to be deposited depending on the nature of the governance proposal. Thus, under the terms set by the Mango DAO, not all MNGO token holders were eligible to submit every type of governance proposal.

73.     Moreover, because governance "[p]roposals are executable code, not suggestions for a team or foundation to implement," according to the Litepaper, not all MNGO token holders may have had the requisite technical skills to submit governance proposals.

74.     As governance proposals were also "subject to a 3 day voting period" and if a "majority and at least 2% of the Mango Token supply are cast for the proposal, it . . . can be implemented after 2 days," according to the Litepaper, only a small percentage MNGO token holders needed to vote for any proposal.

75.     In practice, only a fraction of MNGO token holders actually exercised their potential voting rights.

76.     Immediately following the sale, at least 50% of the circulating MNGO tokens was in the hands of Mango Markets' creators, because they received 5% of the total supply in existence, which was half of the total amount released (the other half having been offered and sold to the general public).

77.     Despite thousands of wallet addresses holding MNGO tokens, on average, approximately five to ten addresses voted on any given proposal, and a small number of repeat wallet addresses dominated the majority of the votes, including wallet addresses controlled by several of the creators of Mango Markets.

78.     In addition, shortly after the MNGO token sale in August 2021, a governance proposal was made to establish a seven-member "mango v3 program upgrade council" ("the "Upgrade Council"), which included the creators of Mango Markets. The proposed Upgrade Council would have the authority to unilaterally (*i.e.*, without a governance proposal) control upgrades of the Mango Markets platform through a majority vote.

79.     The Upgrade Council proposal passed with only 2.29% of the MNGO token supply voting in favor and remains in existence. Of the supporting votes, at least 70% (1.64% out of the total supply or 71.6% of those voting) were cast by two of the creators of Mango Markets.

### III.    Through Mango Markets, Blockworks Foundation and Mango Labs Provide Brokerage Services to U.S. Investors.

80.     Blockworks Foundation and Mango Labs have never registered with the SEC as brokers with respect to their brokerage activities on Mango Markets, and no exemption or exception from registration applies.

81.     Nonetheless, since approximately August 2021, and except for a few months following Eisenberg's exploit in October 2022 when Mango Markets temporarily ceased facilitating transactions through its platform, Blockworks Foundation and Mango Labs have acted as brokers of crypto assets being offered and sold as securities through Mango Markets.

### A.    Blockworks Foundation and Mango Labs Solicit Investors and Hold Themselves Out as Brokers.

82.     Since approximately August 2021, and except for the few months mentioned above, Blockworks Foundation and Mango Labs allowed users of Mango Markets to buy and sell the MNGO token and various other crypto assets, including crypto assets being offered and sold as securities such as MNGO, through the Mango Markets platform in exchange for various other crypto assets.

83.     Blockworks Foundation and Mango Labs also allows users of Mango Markets to

trade so-called crypto asset "perpetual futures," which are a type of derivative contract that allow investors to speculate based on the future value of one crypto asset relative to another crypto asset without an expiration date to the contract.

84.     In addition, Blockworks Foundation and Mango Labs allow users of Mango Markets to borrow crypto assets, including crypto assets being offered and sold as securities, through Mango Markets and to withdraw those borrowed crypto assets from Mango Markets.

85.     Blockworks Foundation and Mango Labs advertise on Mango Markets' websites and social media channels the functionality of Mango Markets, including its abilities to effect transactions for the account of users, and the crypto assets offered and sold as securities through Mango Markets.

      **B.**      **<u>Blockworks Foundation and Mango Labs Provide Advice or Valuations as to the Merits of an Investment in MNGO.</u>**

86.     Blockworks Foundation and Mango Labs also publicly highlight and tout the accelerated increase in price of the MNGO token and the potential for success of the Mango Markets platform.

87.     For example, Blockworks Foundation and Mango Labs publicly stated that MNGO tokens could be used to participate in liquidity pools, that MNGO token holders could earn more as a reward for depositing MNGO tokens into the pools and providing liquidity, and that MNGO token holders could continuously earn interest.

      **C.**      **<u>Blockworks Foundation and Mango Labs Help Facilitate Transactions Through Mango Markets.</u>**

88.     Mango Markets operates through a user interface developed by Blockworks Foundation and Mango Labs (the "Mango UI") (from August 2021 to October 2022, the Mango UI could be found at https://trade.mango.markets, and now it is at https://app.mango.markets).

89.     By accessing or using the Mango UI, investors agree to be bound by Mango

Markets' Terms of Use.

90.    The Mango UI is available to users 24 hours per day, seven days per week.

91.    Users with the requisite technical expertise do not have to go through the Mango UI to access the Mango Markets smart contract; instead, users with advanced technical skills can use the Blockworks Foundation and Mango Markets-provided software libraries to interact directly with the Mango Markets smart contract.

92.    To utilize the brokerage services offered by Mango Markets, a user must first connect a crypto wallet to the platform, and then create and deposit crypto assets into a Mango Markets account.

93.    A user is then able to see her balances and historical performance on the Mango UI.

94.    A user can also use the Mango UI to place orders to exchange one crypto asset for another at the prevailing rate in a third-party market.

95.    Mango Markets users in the United States could deposit the crypto assets held in their wallets into a Mango Markets account.

96.    Blockworks Foundation and Mango Labs purportedly attempted to block users with IP addresses in the United States from submitting orders to engage in spot transactions via Mango Markets; however, U.S. persons placed orders to engage in spot transactions using anonymizing services such as VPNs.

97.    Mango Markets supports investors submitting both limit and market orders with various time-in-force instructions or other trade-related parameters such as immediate-or-cancel.

98.    The Mango UI displays all users' orders, including asset, side, size, and price, for all users to view.

99.     Version 3 of Mango Markets ("Mango v3") was operable from approximately August 2021 to October 2022; the current version 4 of Mango Markets ("Mango v4") became operable in early 2023.

100.    When a user enters an order, the Mango UI invokes a function known in Mango v3 as "Place Spot Order," or in Mango v4 as "Serum3 place order" or "Openbook v3 place order" (collectively, the "Place Order" function) in the Mango Markets smart contract (known as a "program" on the Solana blockchain), which was written by Blockworks Foundation and Mango Labs.

101.    In Mango v3, the Place Order function performed four main tasks:

    a.      Verified the user is eligible to engage in a spot trade, which is the immediate buying or selling of a crypto asset at their current market prices, where the user agrees to buy a crypto asset at the current market rate and take delivery immediately;

    b.      Invoked the "New Order" function on a third-party crypto asset trading platform on the Solana blockchain (Mango v3 used the third-party crypto asset trading platform called Serum, which became defunct in November 2022);

    c.      Invoked the "Settle Funds" function in Serum; and

    d.      Updated the user's Mango Markets account balance.

102.    All four tasks would have to be completed for there to be an execution; if any part of the transaction did not complete, the entire transaction failed.

103.    Successful spot transactions effected by Mango v3 settled immediately on Serum, while failed spot transactions on Mango v3 never created a transaction in Serum.

104.    The Mango UI "listened," which involved polling a Remote Procedure Call ("RPC") node, for a status update on the proposed transaction and informed the user if the order had been successfully executed.

105.    If the transaction was successfully completed, the changes in the user's asset balances were then displayed in the Mango UI.

106.    In Mango v4, which uses the crypto asset trading platform OpenBook, a fork of Serum created after Serum's collapse, the Place Order function performs two main tasks:

a.    Verifies that the user is eligible to engage in a spot trade; and

b.    Invokes the "New Order" function on a third-party crypto asset trading platform on the Solana blockchain.

107.    After invoking the New Order function, the Mango v4 user's order is stored in a queue in OpenBook.

108.    OpenBook users, which could include the Mango v4 user who submitted the order, invoke various OpenBook event-processing functions that match and process the orders in the queue.

109.    Blockworks Foundation and Mango Labs also handle user assets.

110.    As described above, to trade through the Mango Markets platform, the user must first deposit crypto assets into the platform's smart contract.

111.    The Mango Markets smart contract, which was written by Blockworks Foundation and Mango Labs, programmatically transfers the crypto assets from the user's token account ("Token Account") to a Mango Markets token account.

112.    Token Accounts are Solana addresses that hold one specific token for the holder of the private key to that token account.

113.    For example, if a Mango Markets user with wallet address ABCD wants to hold the EXAMPLE token, then the user needs to first create a new token account.

114.    The token account has its own address (*e.g.*, WXYZ), and is owned by address ABCD.

115.    The user can then direct transfers of EXAMPLE token to token account WXYZ.

116.    Because Token Accounts can only hold one type of token, Mango Markets maintains a different vault for every type of token supported by the platform ("Mango Vault").

117.    When a user deposits tokens with the Mango Markets platform, Blockworks Foundation and Mango Labs cause them to be pooled together with tokens deposited by other users into an account over which Mango Markets holds the private keys. Mango Markets maintains a ledger indicating how much of each token is attributable to each user.

118.    Solana addresses controlled by Mango DAO own the Mango Vaults, and the only way to affect changes to these Solana addresses is through either Mango Markets' above-referenced smart contracts, which were written by Blockworks Foundation and Mango Labs, or the Mango DAO governance process.

119.    Users of Mango Markets have no control over their crypto assets held on these Solana addresses.

120.    A spot trade effected by Mango Markets for a user involves three transfers of crypto assets:

        a.    The Mango Markets smart contract, which was written by Blockworks Foundation and Mango Labs, submits an order to OpenBook (in Mango v3, the Mango Markets smart contract would send orders to Serum), which initiates the first transfer. OpenBook (previously Serum under

Mango v3) transfers the crypto assets that the user intends to sell from the corresponding Mango Vault to OpenBook (previously Serum under Mango v3) vault;

b.   OpenBook (previously Serum under Mango v3) transfers the crypto assets that the user bought from the corresponding OpenBook vault into the Mango Vault; and

c.   OpenBook (previously Serum under Mango v3) transfers any unspent crypto assets from the OpenBook vault back into the Mango Vault.

121.   The user does not hold the private keys to any of the aforementioned vaults.

122.   To regain custody of any crypto assets, the user must use the withdraw function to make a withdrawal request from the Mango Markets smart contract, which was written by Blockworks Foundation and Mango Labs.

**D.    The Crypto Assets Traded Through Mango Markets Include Crypto Assets that are Offered and Sold as Securities.**

123.   Blockworks Foundation and Mango Labs, through Mango Markets, effect transactions in crypto assets that are being offered and sold as investment contracts, and thus as securities.

124.   This includes, but is not limited to, MNGO, which, as described above and in the SEC's complaint filed in *SEC v. Eisenberg*, 1:23-cv-503 (S.D.N.Y. Jan. 20, 2023), was offered and sold as a security, and the crypto asset Solana ("SOL"), which has also been the subject of prior SEC enforcement actions based upon having been offered and sold as securities. *E.g., SEC v. Coinbase*, 23-cv-4738, 2024 WL 1304037 (S.D.N.Y. Mar. 27, 2024); *SEC v. Payward, Inc., et al.*, No. 23-cv-06003 (N.D. Cal. Aug. 23, 2024).

125.   "SOL" is the native token of the Solana blockchain. The Solana blockchain was

created by Solana Labs, Inc. ("Solana Labs"), a Delaware corporation headquartered in San Francisco that was founded in 2018 by two individuals ("Solana founders").

126.    Between 2018 and 2020, Solana Labs conducted a series of sales to investors. Between May 2018 and early March 2020, Solana Labs also filed with the SEC multiple forms claiming that its offers and sales of securities – what it described in those forms as the "sale and issuance of rights to receive Solana Labs, Inc. tokens in the future via a Simple Agreement for Future Tokens (SAFTs)"—were exempt from registration under Rule 506(c) of Regulation D under the Securities Act. Through these offers and sales of securities, Solana Labs sold approximately 177 million SOL, raising over $23 million.

127.    Later in March 2020, Solana Labs conducted additional SOL sales on the CoinList trading platform (www.coinlist.co), offering and selling approximately 8 million SOL at an average price of $0.22 per SOL, raising another approximately $1.76 million. In August 2021, Solana Labs completed another sale of SOL, raising over $314 million from investors, each of whom paid for SOL with fiat currency.

128.    Solana Labs stated publicly that it would pool the proceeds from its private and public SOL sales in omnibus crypto asset wallets that it controlled, and that it would use those proceeds to fund the development, operations, and marketing efforts with respect to the Solana blockchain to attract more users to that blockchain (potentially increasing the demand for, and therefore the value of, SOL itself, given the need for those who wish to interact with the Solana blockchain to tender SOL).

129.    For example, in connection with the 2021 sale of SOL, Solana Labs stated publicly that it would use investor funds to: (a) hire engineers and support staff to help grow its developer ecosystem; (b) "accelerate the deployment of market-ready applications focused on

onboarding the next billion users into crypto;" (c) "launch an incubation studio to accelerate the development of decentralized applications and Platforms building on Solana"; and (d) develop a "venture investing arm" and "trading desk dedicated to the Solana ecosystem."

130.    Solana Labs has stated publicly that of the 500 million SOL tokens it initially minted, 12.5% were allocated to the Solana founders, and another 12.5% were allocated to the Solana Foundation.

131.    The Solana Foundation is an organization that describes itself as a "non-profit foundation … dedicated to the decentralization, adoption, and security of the Solana ecosystem." In fact, on April 8, 2020, Solana Labs transferred 167 million SOL tokens to the Solana Foundation, and in its public announcement of the Solana Foundation's formation, Solana Labs stated, "The Foundation's initial focus is expanding and developing the ecosystem of the Solana protocol."

132.    Beginning in February 2020, Solana Labs took steps to make SOL available for trading on crypto asset trading platforms and it has been available on such platforms, including on Mango Markets.

133.    The information Solana Labs and Solana Foundation publicly disseminated, including the initial offers and sales of SOL but continuing through the present, has led SOL holders, including those who purchased SOL through Mango Markets, to view SOL as an investment in and to reasonably expect to profit from Solana Labs' efforts to grow the Solana protocol, which, in turn, would increase the demand for and the value of SOL.

134.    In public statements on its website and social media pages, including statements made and available during the period when SOL has been available to trade through Mango Markets, Solana Labs and the Solana Foundation specified its expertise in developing blockchain

networks and described the efforts Solana and its founders had made and would continue to

make to develop the Solana blockchain protocol and attract users to the technology, which,

again, required those utilizing the technology to demand some amount of SOL.

135.    Solana Labs and Solana Foundation have made such widely disseminated public

statements and undertook other promotional efforts to increase participation in their network and

thus demand for SOL, including with: (a) a Solana podcast of which there have been at least 90

episodes since July 2019, with the latest one being broadcast in September 2024, with interviews

of key Solana Labs management and other key personnel; (b) a YouTube channel managed by

Solana Foundation with over 63,000 subscribers that posts videos about Solana news, events like

their multi-day Solana Breakpoint, ecosystem updates, etc.; and (c) dedicated Telegram, Twitter,

Reddit, Solana Forums, Discord, GitHub, Meetup, and Weibo channels, with links to each

available on the Solana website.

136.    The promotional statements that Solana Labs and the Solana Foundation made in

these fora with respect to SOL and their efforts to increase demand and value for SOL have

continued since Solana Labs' initial distributions of SOL.

137.    Further, Solana Labs markets that it "burns" (or destroys) SOL tokens as part of a

"deflationary model." As a Solana founder explained in an April 14, 2021 article entitled "Solana

(SOL): Scaling Crypto to the Masses" posted on gemini.com, "Solana transaction fees are paid in

SOL and burnt (or permanently destroyed) as a deflationary mechanism to reduce the total

supply and thereby maintain a healthy SOL price." As explained on the Solana website, since the

Solana network was launched, the "Total Current Supply" of SOL "has been reduced by the

burning of transaction fees and a planned token reduction event." This marketed burning of SOL

as part of the Solana network's "deflationary mechanism" has led investors reasonably to view

their purchase of SOL as having the potential for profit to the extent there is a built-in mechanism to decrease the supply and therefore increase the price of SOL.

138.    Blockworks Foundation and Mango Labs were required to, but did not, register as brokers with respect to the Mango Markets platform. As fully set forth in the preceding paragraphs, Blockworks Foundation and Mango Labs engaged in the business of effecting transactions in various crypto assets offered and sold as securities, including in MNGO and SOL, for the accounts of others. Specifically, each of Blockworks Foundation and Mango Labs held themselves out as brokers by advertising on Mango Markets' websites and social media channels that Mango Markets was a place to effect crypto assets transactions, including crypto assets offered and sold as securities.

139.    Blockworks Foundation and Mango Labs also actively solicited and recruited investors to use the Mango Markets platform to trade various crypto assets being offered and sold as securities, including MNGO and SOL, by regularly advertising and promoting the features and benefits of the Mango Markets platform on Mango Markets websites and social media channels.

140.    Each of Blockworks Foundation and Mango Labs provided advice or valuations as to the merits of an investment in MNGO by touting the accelerated growth of the MNGO token and its potential for success, as well as telling investors that MNGO tokens could be used to participate in liquidity pools, that MNGO token holders could earn more as a reward for providing liquidity, and that MNGO token holders could continuously earn interest on their tokens.

141.    Additionally, each of Blockworks Foundation and Mango Labs helped to facilitate transactions on the Mango Markets platform by assisting users in opening accounts,

routing users' orders, and regularly handling user funds and securities.

142.    Blockworks Foundation and Mango Labs were therefore required to register with the SEC as brokers or operate pursuant to an exemption or exception but did not do so.

### FIRST CLAIM FOR RELIEF
**Violations of Sections 5(a) and 5(c) of the Securities Act**
**(Mango DAO and Blockworks Foundation)**

143.    The SEC repeats, realleges, and incorporates by reference paragraphs 1 through 142, as though fully set forth therein.

144.    By virtue of the foregoing, each of Mango DAO and Blockworks Foundation, through their offers and sales of the MNGO tokens, directly and indirectly: (a) without a registration statement in effect as to those securities, (1) made use of the means and instruments of transportation or communications in interstate commerce and of the mails to sell securities through the use or medium of any prospectus or otherwise, and (2) carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities for the purpose of sale or for delivery after sale; and (b) made use of the means and instruments of transportation or communication in interstate commerce and of the mails to offer to sell through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

145.    By reason of the conduct described above, each of Mango DAO and Blockworks Foundation, directly or indirectly violated, is violating, and, unless enjoined will continue to violate Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a) and (c)].

### SECOND CLAIM FOR RELIEF
**Violations of Section 15(a) of the Exchange Act**
**(Mango Labs and Blockworks Foundation)**

146.    The SEC repeats, realleges, and incorporates by reference paragraphs 1 through

142, as though fully set forth therein.

147.    By engaging in the acts and conduct described in this Complaint, each of Mango Labs and Blockworks Foundation, each a person other than a natural person under the Exchange Act, is a broker and made use of the mails and the means and instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, securities, without registering as a broker, and without being exempted from such registration.

148.    By reason of the conduct described above, each of Mango Labs and Blockworks Foundation, directly or indirectly, violated, are violating, and, unless enjoined, will continue to violate Exchange Act Section 15(a) [15 U.S.C. § 78o(a)].

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE,** the SEC respectfully requests that the Court enter a Final Judgment:

### I.

Finding that Defendants violated the statutes and rules set forth in this Complaint as to each;

### II.

Permanently restraining and enjoining Defendants, and all persons in active concert or participation with them, from violating, directly or indirectly, the statutes and rules set forth in this Complaint as to each;

### III.

Ordering Defendants to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

### IV.

Granting such other and further relief as the Court determines to be necessary and appropriate.

## V.

Retaining jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered.

### JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff SEC demands that this case be tried to a jury.

Date:    September 27, 2024

Respectfully submitted,

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION

*/s/ Alyssa A. Qualls*
Alyssa A. Qualls (AQ-4247)
Kristin Pauley (KP-7633)
Attorneys for Plaintiff
United States Securities and Exchange Commission
Chicago Regional Office
175 West Jackson Blvd., Suite 1450
Chicago, Illinois 60604
(312) 353-7390
(312) 353-7398 (facsimile)
QuallsA@sec.gov
PauleyK@sec.gov